UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN RE:

|  |  |
|---|---|
| | Case No. 3:11-bk-03851-PMG |
| ROBERTS LAND & TIMBER | and Case No. 3:11-bk-03853-PMG |
| INVESTMENT CORP., | |
| | |
| Debtor, | |
| | |
| and | Jointly Administered Under |
| | Case No. 3:11-bk-03851-PMG |
| UNION LAND & TIMBER CORP, | |
| | |
| Chapter 11 Debtors. | |

_____

**DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**

     The Debtors and Debtor-in-Possessions, Roberts Land & Timber Investment Corp. and Union Land & Timber Corp. (the "Debtor" or "Debtors"), through the undersigned counsel, pursuant to §§ 1121 and 1123, Title 11, the United States Code (the "Bankruptcy Code") and the Rule 3016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), proposes this Chapter 11 Plan of Reorganization (the "Plan") for the resolution of the Claims against and interests in the Debtor. The Debtor is the proponent of this Plan within the meaning of §1129 of the Bankruptcy Code.

Article 1
Introduction

     1.1    Disclosure Statement. Contemporaneously with the filing of the Plan, the Debtors filed and served a Disclosure Statement, as required by § 1125 of the Bankruptcy Code. The Disclosure Statement contains the history of the Debtor, financial information regarding the Debtors and his assets, and a solicitation of acceptances of this Plan.

     1.2    Property and Claims. This Plan deals with all property of the Debtors and provides for treatment of all Claims against and Interests in the Debtors and their property.

Article 2
Definitions and General Provisions

For the purposes of this Plan, except as otherwise expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article 2.1 of this Plan. Any term that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term therein.

2.1     The following terms, when used in this Plan, shall have the following meaning:

2.1.1   "Administrative Claim" means a Claim for payment of an administrative expense entitled to priority under § 507(a)(1) of the Bankruptcy Code.

2.1.2   "Allowed Claim" shall mean a Claim or any portion thereof that is enforceable against the Debtor or enforceable against the property of the Debtor under §§ 502 or 503 of the Bankruptcy Code.

2.1.3   "Allowed Secured Claim" shall mean the amount of the allowed Claim held by parties secured by property of the Debtor which is equal to the amount stipulated as constituting the allowed secured claim between the parties, or such amount as the Bankruptcy Court allows.

2.1.4   "Allowed Unsecured Claim" shall mean Allowed Claims which are not allowed administrative, priority, or secured claims.

2.1.5   "Assets" means, collectively, all of the property, as defined by § 541 of the Bankruptcy Code, of the Estate of the Debtor (including without limitation, all of the assets, property, interests (including equity interests) and effects, real and personal, tangible and intangible, including all Avoidance Actions), wherever situated as such properties exist on the Effective Date or thereafter.

2.1.6   "Avoidance Action" means any claim or cause of action of the Estate arising out of or maintainable pursuant to §§ 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code or any other similar applicable law, regardless of whether such action has been commenced prior to the Effective Date.

2.1.7   "Ballot" means each of the ballot forms that are distributed with the Disclosure Statement to Holders of Claims included in the Classes that are Impaired under this Plan and are entitled to vote.

2.1.8   "Bankruptcy Case" means the chapter 11 case initiated by the Debtor's filing on the Filing Date of a voluntary petition for relief in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code.

2.1.9   "Bankruptcy Code" means Title 11 of the United States Code.

2.1.10  "Bankruptcy Court" means the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division.

2.1.11 "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure.

2.1.12 "Business Day" means any day on which the commercial banks are required to be open for business in Jacksonville, Florida.

2.1.13 "Cash" means legal tender of the United States of America and equivalents thereof.

2.1.14 "Causes of Action" means all Avoidance Actions and any and all of the Debtor's actions, suits, accounts, agreements, promises, rights to payment and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured, and whether asserted or assertable directly or derivatively, in law, equity, or otherwise.

2.1.15 "Chapter 11" shall mean chapter 11 of the Bankruptcy Code.

2.1.16 "Claim" means a claim against the Debtor whether or not asserted, as defined in section 101(5) of the Bankruptcy Code.

2.1.17 "Claims Objection Deadline" means the later of the first Business Day which is (i) thirty (30) days after the Effective Date, or (ii) such other time as may be ordered by the Bankruptcy Court, as such dates may be from time to time extended by the Bankruptcy Court without further notice to parties in interest.

2.1.18 "Classes" means a category of Claims or Interests described in this Plan.

2.1.19 "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order.

2.1.20 "Confirmation Hearing" means the hearing before the Bankruptcy Court held to consider confirmation of this Plan and related matters under § 1128 of the Bankruptcy Code, as such hearing may be continued.

2.1.21 "Confirmation Order" means the order confirming this Plan pursuant to §1129 of the Bankruptcy Code that the Bankruptcy Court enters, which shall be in all respects reasonably acceptable to the Debtor.

2.1.22 "Debtor" shall mean Roberts Land & Timber Investment Corp. and Union Land & Timber Corp., the Debtors and Debtors-in-Possession in this Jointly Administered Bankruptcy Case.

2.1.23  "Disallowed Claim" means a Claim or any portion thereof that (i) has been disallowed by a Final Order, (ii) is listed in any of the Debtor's Schedules at zero, unknown, contingent, disputed, or unliquidated and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court, or (iii) is not listed in the Debtor's Schedules and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court.

2.1.24  "Disclosure Statement" means the Disclosure Statement for Plan of Reorganization filed by Debtor as approved by the Bankruptcy Court pursuant to § 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such Disclosure Statement may be amended, modified or supplemented from time to time.

2.1.25  "Disputed Claim" means, with reference to any Claim, a Claim or any portion thereof, that is the subject of an objection timely filed in the Bankruptcy Court and which objection has not been withdrawn, settled or overruled by a Final Order of the Bankruptcy Court.

2.1.26  "Distribution" means any distribution by the Debtor to a Holder of an Allowed Claim.

2.1.27  "District Court" means the United States District Court for the Middle District of Florida, Jacksonville Division.

2.1.28  "Effective Date" means the date that is sixty (60) days after entry of the Confirmation Order.

2.1.29  "Equipment" shall mean the machinery, fixtures, equipment, and other supplies used by the Debtor in the operation or conduct of its business.

2.1.30  "Estate" means, with regard to the Debtor, the estate that was created by the commencement by the Debtor of the Bankruptcy Case pursuant to § 541 of the Bankruptcy Code, and shall be deemed to include, without limitation, any and all rights, powers, and privileges of such Debtor and any and all interests in property, whether real, personal or mixed, rights, causes of action, avoidance powers or extensions of time that such Debtor or such estate shall have had as of the commencement of the Bankruptcy Case, or which such Estate acquired after the commencement of the Bankruptcy Case, whether by virtue of §§ 541, 544, 545, 546, 547, 548, 549 or 550 of the Bankruptcy Code, or otherwise.

2.1.31  "Executory Contract or Unexpired Lease" means all executory contracts and unexpired leases to which the Debtor is a party.

2.1.32  "Filing Date" means May 25, 2011.

2.1.33 "Final Distribution" means the Distribution by the Debtor that satisfies all Allowed Claims to the extent provided in accordance with the Plan.

2.1.34 "Final Distribution Date" means the Distribution Date on which the Final Distribution is made.

2.1.35 "Final Order" means an order of the Bankruptcy Court, the District Court, or any other court as to which (i) any appeal that has been taken has been finally determined or dismissed, or (ii) the time for appeal has expired and no appeal has been filed timely. In the case of an order of the Bankruptcy Court, the time for appeal, for purposes of this definition, shall be the time permitted for an appeal to the District Court.

2.1.36 "Holder" means a holder of a Claim or Interest, as applicable.

2.1.37 "Impaired" shall have the meaning ascribed thereto in § 1124 of the Bankruptcy Code.

2.1.38 Reserved for Future Use.

2.1.39 "Interests" means the equity interests in the Debtor.

2.1.40 "Lien" has the meaning set forth in § 101(37) of the Bankruptcy Code.

2.1.41 "Person" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in § 101(27) of the Bankruptcy Code) or other entity.

2.1.42 "Plan" means this plan of reorganization as the same may hereafter be corrected, amended, supplemented, restated, or modified.

2.1.43 Reserved for Future Use.

2.1.44 "Priority Claim" means a Claim entitled to priority under the provisions of § 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or a Priority Tax Claim.

2.1.45 "Priority Tax Claim" means a Claim against the Debtor that is of a kind specified in § 507(a)(8) of the Bankruptcy Code.

2.1.46 "Professional Compensation" means (1) any amounts that the Bankruptcy Court allows pursuant to section 330 of the Bankruptcy Code as compensation earned, and

reimbursement of expenses incurred, by professionals employed by the Debtor and the unsecured creditors' committee, if any, and (ii) any amounts the Bankruptcy Court allows pursuant to §§ 503(b)(3) and (4) of the Bankruptcy Code in connection with the making of a substantial contribution to the Bankruptcy Case.

2.1.47 "Record Date" means the date established in the Confirmation Order or any other Final Order of the Bankruptcy Court for determining the identity of holders of Allowed Claims entitled to Distributions under this Plan. If no Record Date is established in the Confirmation Order or any other order of the Bankruptcy Court, then the Record Date shall be the Confirmation Date.

2.1.48 "Record Holder" means the Holder of a Claim as of the Record Date.

2.1.49 "Released Parties" means collectively the Debtor.

2.1.50 "Retained Action" means all claims, Causes of Action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, which the Debtor or Debtor's Estate may hold against any Person, including, without limitation, (i) claims and Causes of Action brought prior to the Effective Date, (ii) claims and Causes of Action against any Persons for failure to pay for products or services provided or rendered by the Debtor, (iii) claims and Causes of Action relating to strict enforcement of the Debtor's intellectual property rights, including patents, copyrights and trademarks, (iv) claims and Causes of Action seeking the recovery of the Debtor's accounts receivable or other receivables or rights to payment created or arising in the ordinary course of the Debtor's business, including without limitation, claim overpayments and tax refunds, and (v) all Causes of Action that are Avoidance Actions.

2.1.51 "Schedules" means the Schedules of Assets and Liabilities the Debtor filed in the Bankruptcy Case, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009.

2.1.52 "Secured Claim" means a Claim against the Debtor to the extent secured by a Lien on any property of the Debtor on the Petition Date to the extent of the value of said property as provided in § 506(a) of the Bankruptcy Code.

2.1.53 "Subordinated Claim" means any Unsecured Claim that is subordinated in priority to all other Allowed Unsecured Claims pursuant to the provisions of § 510 of the Bankruptcy Code or other applicable law.

2.1.54 "Unimpaired" means, with respect to a Class of Claims or Interests, any Class that is not Impaired.

2.1.55 "Unsecured Claim" means any Claim against the Debtor that is not a Secured Claim, a Priority Claim, a Priority Tax Claim, or an Administrative Expense Claim.

2.2     Time. Whenever the time for the occurrence or happening of an event as set forth in this Plan falls on a day which is a Saturday, Sunday, or legal holiday under the laws of the United States of America or the State of Florida, then the time for the next occurrence or happening of said event shall be extended to the next day following which is not a Saturday, Sunday, or legal holiday.

2.3     Events of Default. In the event of a default by Debtor in payments under the Plan or otherwise, the Holder of such Claim must send written notice to Debtor at the addresses of record for Debtor as reflected on the docket for this Bankruptcy Case, unless such Holder has received written notice of a change of address for Debtor, as applicable. The Holder of such Claim must send such Notice via certified mail with a courtesy copy via email and regular mail to Andrew J. Decker, III, Esquire, of The Decker Law Firm, P.A. at the address reflected in the then current directory of the Florida Bar.  The Debtor shall have ten (10) days from the Debtor's receipt of the notice of default to cure such default. Receipt by the Debtor's Attorney is for courtesy notice only and shall not be deemed receipt by the Debtor of the required Notice.

Article 3
Classification of Claims and Interests; Impairment

3.1     Summary. The categories of Claims and Interests set forth below classify all Claims against and Interests in the Debtor for all purposes of this Plan. A Claim or Interest shall be deemed classified in a particular Class only to the extent the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. The treatment with respect to each Class of Claims and Interests provided for in Article 4 shall be in full and complete satisfaction, release and discharge of such Claims and Interests.

3.2     Class 1 shall consist of the United States Internal Revenue Service for unpaid priority, unsecured taxes.

3.3     Class 2 shall consist of the State of Florida Department of Revenue for unpaid priority, unsecured taxes.

3.4     Class 3 shall consist of the Claims of TD Bank, National Association, as the successor by merger with Carolina First Bank, a South Carolina corporation, as previous successor by merger with Mercantile Bank ("TD Bank").

3.5     Class 4 shall consist of the Claims of Farm Credit of Florida, ACA, as successor by merger to Farm Credit of North Florida, ACA ("Farm Credit").

3.6     Class 5 shall consist of the Claims of Community State Bank.

3.7     Class 6 shall consist of Unsecured Claims.

Article 4
Treatment of Claims and Interests

A brief summary of the Classes, the treatment of each Class, and the voting rights of each Class is set forth below.

Nothing herein shall constitute an admission as to the nature, validity, or amount of claim. Debtor reserves the right to object to any and all claims.

Debtor reserves the right to prepay any claim in full at any time in accordance with the terms of the Plan (i.e. at the percentage distribution designated in the Plan) without prepayment penalty.

4.1     Class 1: Internal Revenue Service Tax Claims. The amount of any Internal Revenue Service tax claim that is not otherwise due and payable on or prior to the Effective Date, and the right of the Internal Revenue Service, if any, to payment in respect thereto shall (i) be determined in the manner in which the amount of such Claim and the rights of the Internal Revenue Service would have been resolved or adjudicated if the Bankruptcy Case had not been commenced, (ii) survive after the Effective Date as if the Bankruptcy Case had not been commenced, and (iii) not be discharged pursuant to section 1141 of the Bankruptcy Code. Debtor reserves the right to pay any tax claim in full at any time.

4.1.a     Priority Tax Claim of the Internal Revenue Service: Class 1(a) consists of any priority tax claim of the Internal Revenue Service that may be filed in this case.

The Debtor shall pay the Internal Revenue Service the amount of any priority tax claim that may be filed in equal monthly payments over a period not later than 5 years after the date of the Order for Relief under §301 of the Bankruptcy Code commencing on the Effective Date and continuing on the 30th day of each month thereafter until the IRS' Class 1(a) priority tax claim is paid in full. The Internal Revenue Service's Class 1(a) priority tax claim shall accrue interest on the outstanding balance from the Effective Date calculated at the fixed rate of 4% per annum or such lesser rate agreed to by the IRS.

Based on the information known and available to the Debtor, as of the date of the filing of this Chapter 11 Case, the Internal Revenue Service did not hold a priority tax claim; accordingly, the monthly payment to the Internal Revenue Service on its Class 1(a) priority tax claim shall be $00.00.

4.1.b     General, Non-Priority Unsecured Tax Claim of the Internal Revenue Service: Class 1(b) shall consist of any general, non-priority unsecured tax claim of the Internal Revenue Service that may be filed in this case.  If a non-priority, unsecured tax claim is filed, the Debtor shall pay the Internal Revenue Service one-hundred percent (100%) of such tax claim in sixty (60) equal monthly payments commencing on the Effective Date and continuing on or before the 30th day of each month thereafter.

Based on the information known and available to the Debtor, as of the date of the filing of this Chapter 11 Case, the Internal Revenue Service did not hold a general, non-priority, unsecured tax claim; accordingly, the monthly payment to the Internal Revenue Service on its Class 1(b) tax claim shall be $00.00.

A failure by the Debtor to make a Class 1 payment to Internal Revenue Service pursuant to the terms of the Plan shall be an event of default. If the Debtor fails to cure an event of default as to a Class 1 tax payment within twenty (20) days notice of default by the Internal Revenue Service to the Debtor and Debtor's counsel, then the Internal Revenue Service may (a) enforce the entire amount of its Class 1(a) tax claim; (b) exercise any and all rights and remedies it may have under applicable federal non-bankruptcy or state law; and (c) seek such relief as may be appropriate in the Bankruptcy Court.

The Holder of the Class 1 Claim is impaired and entitled to vote to accept or reject the Plan. Nothing contained herein shall prohibit the Debtor from objecting to the Class 1 Claims for any reason.

4.2    Class 2: State of Florida Department of Revenue:

The amount of any State of Florida Department of Revenue Tax Claim that is not otherwise due and payable on or prior to the Effective Date, and the right of the State of Florida Department of Revenue, if any, to payment in respect thereto shall (i) be determined in the manner in which the amount of such Claim and the rights of the State of Florida Department of Revenue would have been resolved or adjudicated if the Bankruptcy Case had not been commenced, (ii) survive after the Effective Date as if the Bankruptcy Case had not been commenced, and (iii) not be discharged pursuant to section 1141 of the Bankruptcy Code. Debtor reserves the right to pay any tax claim in full at any time.

Class 2 shall consist of any tax claim of the State of Florida Department of Revenue that may be filed in this Chapter 11 Case. To the best information, knowledge and belief of the Debtor, the State of Florida Department of Revenue does not hold and will not be filing a tax claim in this case.

In the event that the State of Florida Department of Revenue files a Class 2 priority and/or secured tax claim by the claims bar date, the Debtor shall pay the full amount of the State of Florida Department of Revenue allowed priority and/or secured tax claim in equal monthly payments over a period not later than 5 years after the date of the Order for Relief under §301 of the Bankruptcy Code commencing on the Effective Date and continuing on the 30th day of each month thereafter until the claim is paid in full. In the event the State of Florida Department of Revenue holds a tax lien against any of Debtor's property, such lien shall continue and attach to Debtor's property to the same extent, validity and priority as existed on the Filing Date. Upon the State of Florida Department of Revenue's receipt of its final Class 2 distribution, the State of Florida Department of Revenue shall cancel its tax lien.

In the event the State of Florida Department of Revenue files a Class 2 general unsecured tax claim, the Debtor shall pay an aggregate Distribution of one hundred percent (100%) with respect to the State of Florida Department of Revenue's allowed general tax claim in 60 equal monthly payments commencing on the Effective Date and continuing on the 30th day of each month.

A failure by the Debtor to make a payment to the State of Florida Department of Revenue pursuant to the terms of the Plan shall be an event of default. If the Debtor fails to cure an event of default as to tax payments within twenty (20) days notice of default by the State of Florida Department of Revenue to the Debtor and Debtor's counsel, then the State of Florida Department of Revenue may (a) enforce the entire amount of its allowed Class 2 priority or secured tax claim; (b) exercise any and all rights and remedies it may have under applicable state law; and (c) seek such relief as may be appropriate in the Bankruptcy Court.

The Holder of the Class 2 Claim is impaired and entitled to vote to accept or reject the Plan. Nothing contained herein shall prohibit the Debtor from objecting to the Class 2 Claim for any reason.

4.3     Class 3: TD Bank, National Association, as the successor by merger with Carolina First Bank, a South Carolina corporation, as previous successor by merger with Mercantile Bank.

> 4.3(a) Secured Claim of TD Bank. Class 3(a) consists of the secured claim of TD Bank, Loan Number 5610081217, in the amount of $199,042.68 which is secured by the Debtor's business office and ten acres as described in that certain first priority Mortgage dated April 20, 2006, recorded in Official Record Book 232, Pages 1 through 20 (also referenced as Instrument Number 20060001433), Public Records of Union County, Florida. The Debtor values this real property at $570,000.00. The Debtor shall pay TD Bank the sum of $199,042.68 in monthly installments amortized at 5.00% per annum over a 20-year term; provided, however, that this indebtedness shall mature and be subject to a balloon payment of the entire principal balance and any accrued and unpaid interest 6 years from the Effective Date.

> 4.3(b) Partially Secured Claim of TD Bank. Class 3(b) consists of the undersecured claim of TD Bank, Loan Number 56100067291, in the amount of $500,000.00 which is secured by the Debtor's business office and ten acres in accordance with the terms and conditions of that certain Roberts/Mercantile Bank Mediation Agreement dated March 9, 2011, arising out of that certain civil action filed as "Palmetto Bluff Timberlands, LLC and Avery C. Roberts v. TD Bank, National Association, Case No. 2010-150-CA." The Debtor values this real property at $570,000.00, but this collateral is subject to the balance of $199,042.68 owed on the first priority mortgage leaving a secured claim in the amount of $370,957.32 and an unsecured claim in the amount of $129,042.68. The Debtor shall pay TD Bank the sum of

$370,957.32 in monthly installments amortized at 5.00% per annum over a 20-year term; provided, however, that this indebtedness shall mature and be subject to a balloon payment of the entire principal balance and any accrued and unpaid interest 6 years from the Effective Date.

The Holder of the Class 3 Claims is impaired and entitled to vote to accept or reject the Plan. Nothing contained herein shall prohibit the Debtor from objecting to the Class 3 Claims for any reason.

4.4. Class 4: Farm Credit of Florida, ACA, as successor by merger to Farm Credit of North Florida, ACA.

4.4(a) Secured Claim of Farm Credit of Florida, ACA, as successor by merger to Farm Credit of North Florida, ACA, holds a first priority mortgage lien in various tracts of real property to secure an indebtedness of approximately $11,300,819.22. Farm Credit's mortgage liens arise in accordance with the following instruments:

i.     Mortgage recorded in Official Record Book 226, Page 547, Public Records of Union County, Florida; and

ii.    Mortgage recorded in Official Record Book 237, Page 156, Public Records of Union County, Florida, and also recorded as Instrument Number 200600007454 in the Public Records of Baker County, Florida; and

iii.   Mortgage Modification and Spreading Agreement; and Notice of Future Advance which was recorded in the Public Records of Baker County, Florida, as Instrument Number 200900000474, and as Instrument Number 200912001340, in Official Record Book 1166, Page 373, Public Records of Columbia County, Florida, and as Instrument Number 20090000241, in Official Record Book 270, Page 296, Public Records of Union County, Florida.

All of the loan documents attached hereto as Plaintiffs' Exhibits 1 through 14 comprise the relevant loan documents for the loans inventoried and held by Farm Credit on its books and records as Loan Numbers 03-079-064-767194-01,02 and 03 (formerly 03-084-001 -767194-01) and also formerly 084-001-0510-4765-10) and 83-084-094-496711 (formerly 084-001-05157029-10).

In full satisfaction, release and discharge of all indebtedness represented by the loans referenced in the foregoing paragraph, the Debtor shall, within 10 days of the Effective Date, execute and deliver to Farm Credit a Special

Warranty Deed in recordable form, together with such additional papers and instruments as may be required for title insurance purposes, conveying its entire fee simple interest in and to the following described real property situated in Baker County, Florida, and referred to as the Woodstock Industrial Site:

Parcel 29:

(Tax Parcel #: 08-3S-20-0000-0000-0010) Portion of following described lying South of I-10: All of Section 8, Township 3 South, Range 20 East, LESS right-of-way, Baker County, Florida

Parcel 33:

(Tax Parcel #: 09-3S-20-0000-0000-0010) Portion of the following described lying South of I-10: All of Section 9, Township 3 South, Range 20 East, LESS 62 acres for Interstate 10 right-of-way, Baker County, Florida

Parcel 53:

That portion of the following described lying in NW 1/4 of NW 1/4 and S 1/2 of NW 1/4 lying North of Rail Road:

(Tax Parcel #: 16-3S-20-0000-0000-0020) The West 1/2, LESS the NE 1/4, and LESS land recited in Deed Book 28, page 202; LESS right-of-way, and LESS land recited in Official Records Book 95, page 116; and all of that portion of the SW 1/4 and the South 1/2 of the NW 1/4 lying North of the Seaboard Coast Line Railroad, all in Section 16, Township 3 South, Range 20 East Baker County, Florida.

Parcel 58:

(Tax Parcel #: 17-3S-20-0000-0000-0020) Portion of the following described lying North of Railroad, All of Section 17, Township 3 South, Range 20 East, North of the Railroad, Baker County, Florida

Said Parcels 29, 33, 53 and 58, together with that certain access easement created and reserved in Special Warranty Deed recorded in Official Records Book 103, page 262, as

assigned in Assignment of Access Easement Agreement recorded in Official Records Book 2002, page 6851, Public Records of Baker County, Florida, over the following described 60' easement:

60 Foot Easement: A portion of Section 16, Township 3 South, Range 20 East, more particularly described as follows:

Commence at the Southwest corner of Section 16, Township 3 South, Range 20 East being a found concrete monument thence run North 02 degrees, 02 minutes, 40 seconds East along the West line of said section a distance of 1995.97 feet to its intersection with the North right-of-way line of U.S. Highway 90 (a 100' right-of-way as now established) being a set 4x4 concrete monument; thence run North 66 degrees, 50 minutes, 23 seconds East along said North right-of-way line a distance of 2196.48 feet to a set concrete monument and the point of beginning; thence departing from said North right-of-way line run North 27 degrees, 53 minutes, 44 seconds West a distance of 377.93 feet to a set concrete monument; thence run North 02 degrees, 46 minutes, 25 seconds West a distance of 50.22 feet to its intersection with the South right-of-way line of Seaboard Airlines Railroad (a 200' right-of-way as now established) being a set 4x4 concrete monument; thence run North 68 degrees, 21 minutes, 48 seconds East along said right-of-way line a distance of 63.41 feet to a set concrete monument; thence run South 02 degrees, 46 minutes, 25 seconds East a distance of 57.35 feet to a set concrete monument; thence run South 27 degrees, 53 minutes, 44 seconds East a distance of 369.53 feet to its intersection with the North right-of-way of U.S. 90 being a set concrete monument; thence run South 66 degrees, 50 minutes, 23 seconds West along said North right-of-way line a distance of 60.21 feet to the point of beginning.

US HIGHWAY 90 TRACT:

Township 3 South, Range 20 East, Baker County, Florida

Section 15: That portion of the N1/2 of the NW 1/4 lying North of the SCL Railroad right-of-way and West of the U.S. Interstate 10 right-of-way.

Section 16:  The NE 1/4 of the NW 1/4 and that portion of the NE 1/4 lying North of the SCL Railroad right-of-way; less and except the US Interstate 10 right-of-way.

Township 3 South, Range 20 East, Baker County, Florida

Section 17:  That portion of the S 1/2 lying South of the SCL Railroad right-of-way and North of the US Highway 90 right-of-way.

Section 18:  That portion of the SE 1/4 lying South of the SCL Railroad right-of-way.

Upon the execution and delivery of the above referenced Special Warranty Deed with respect to the real property situated in Baker County, Florida, and referred to as the Woodstock Industrial Site, Farm Credit shall execute and deliver to the Debtor a Satisfaction or Release of Mortgage Liens with respect to the following described real property in Columbia and Union Counties, Florida:

A parcel of land lying, being and situate in Section 23, Township 5 South, Range 19 East, Union County; Florida, more particularly described as follows: Commence at the Southeast corner of said Section 23, and run North 01°26'41" West, along the East line of said Section 23, a distance of 1772.43 feet; thence run South 88°33'19" West, a distance of 547.12 feet to the Point of Beginning of the hereinafter described parcel of land; thence run South 12°49'06" East a distance of 431.97 feet; thence run South 19°37'06" West a distance of 346.25 feet; thence run South 35°06'57" West a distance of 385.98 feet to the intersection with the Northeasterly right-of-way line of State Road Number 100; thence run North 61°22'40" West along said Northeasterly right of way line of State Road Number 100, a distance of 33.06 feet; thence run North 26°56'06" East a distance of 300.18 feet; thence run North 52°34'00" West a distance of 665.19 feet; thence run North 02°22'22" West a distance of 295.58 feet; thence run North 83°15'02" East a distance of 680.64 feet to the Point of Beginning.

State Road Highway 100 Tract

The centerline of the run of Swift Creek as it has been established as referenced herein by that Centerline Sketch of Description as provided by One51 Inc. dated May 15, 2004.

14

Township 5 South, Range 19 East, Union County, Florida:

Section 1: That portion of the S 1/2 lying South of the centerline of the run of Swift Creek and West of CR 231.

Section 10: That portion of the SE 1/4 lying South of the centerline of the run of Swift Creek.

Section 11: That portion lying South of the centerline of the run of Swift Creek.

Section 12: That portion lying South of the centerline of the run of Swift Creek less and except the West 1/2 of the SW 1/4.

Section 13: The East 1/2 of the NW 1/4; the NE 1/4; and the S 1/2 less and except a twenty-eight acre parcel located in the S 1/2 of the SE 1/4 as described in O. R. Book 62, Page 40, public records of Union County, Florida. Also, less and except the following described parcel of land: A parcel of land containing a total area of 5.0 acres, more or less, lying, being and situate in Section 13, Township 5 South, Range 19 East, Union County, Florida, more particularly described as follows:

Commence at the Southwest corner of the Southwest 1/4 of Southeast 1/4 of said Section 13, and run North 02°27'23" West a distance of 600.00 feet; thence run North 89°04'16" East a distance of 381.00 feet to the Point of Beginning of the hereinafter described parcel of land; thence run North 00°55'44" West a distance of 200.00 feet; thence run North 89º04'16" East a distance of 1090.00 feet; thence run South 00°55'44" East a distance of 200.00 feet; thence run South 89°04'16" West a distance of 1090.00 feet to the Point of Beginning.

Section 14: The W1/2 of the NW 1/4; the NE 1/4 of the NW 1/4; the N 1/2 of the NW 1/4 of the NE 1/4; the SW 1/4; and the W 1/2 of the SE 1/4.

Section 15: The entire section less and except the portions lying South of the State Road Highway 100 right of way and North of the centerline of the run of Swift Creek

Section 16: That portion lying North and East of the State Road Highway 100 right of way and South of the centerline of the run of Swift Creek; less and except a parcel of land containing a total area

of 10.00 acres, more or less, lying, being and situate in Section 16, Township 5 South, Range 19 East, Union County, Florida, being more particularly described as follows: Commence at the Northeast corner of said Section 16, thence run South 01°14'48" East along the East line of said Section 16, a distance of 4248.63 15 feet to the intersection with the Northerly right of way line of State Road Number 100; thence run North 61°21 '22" West, along said Northerly right of way line, a distance of 1355.10 feet to the Point of Beginning of the hereinafter described parcel of land; thence continue running North 61°21 '22" West, continuing along said Northerly right of way line, a distance of 722.43 feet; thence run North 28°33'03" East, a distance of 610.65 feet; thence run South 59°00'04" East a distance of 409.65 feet; thence run South 60°48'31" East a distance of 313.17feet; thence run South 28°33'03" West a distance of 357.08 feet; thence run South 63°08'21" East, a distance of37.93 feet; thence run South 28°45'10" West a distance of 97.42 feet; thence run North 59°33'52" West a distance of 37.59 feet; thence run South 28°33'03" West a distance of 138.68 feet to the Point of Beginning.

Section 22: That portion of the N 1/2 lying North and East of the State Road Highway 100 right of way; less and except a parcel held by the State of Florida Division of Forestry described as follows: A parcel of land for tower site in said Section 22, Township 5 South, Range 19 East; Begin at intersection of East line of said Section 22 and North right of way line of State Highway; thence North 61° West 206.0 feet to Point of Beginning; thence North 31° East 348.0 feet; thence North 61° West 257.0 feet; thence South 31° West 348.0 feet to said North right of way line of said State Highway; thence South 61° East 257.0 feet along said North right of way line of said State Highway to Point of Beginning.

Section 23: That portion of the N 1/2 lying North and East of the State Road 100 right of way and that portion of the N 1/2 of the SW1/4 lying North and East of the State Road Highway 100 right of way; less and except a 2.25 acre parcel lying in the SE 1/4 of theNE1/4 held by Clay Electric; and said 2.25 acre parcel being more particularly described in Deed Book 26, Page 281, public records of Union County, Florida.

Section 24: The entire section except the following: the SW 1/4 of the SW 1/4; thence E 1/2 of the SE 1/4; and that parcel described in O. R. Book 62, Page 40, public records of Union County, Florida.

Section 25: That portion of the NE 1/4 of the NW 1/4 lying North and East of the State Road Highway 100 right of way, less and except that West 450 feet as described in O. R. Book 79, Page 385, public records of Union County, Florida.

West Half of Southwest Quarter (W 1/2 of SW 1/4), Section 12, West Half of Northwest Quarter (W 1/2 of NW 1/4), Section 13; East Quarter (E 1/4); Southwest Quarter of Northeast Quarter (SW 1/4 of NE 1/4); South 13 acres of Northwest Quarter of Northeast Quarter (NW 1/4 of NE 1/4); and Southeast Quarter of Northwest Quarter (SE 1/4 of NW 1/4), Section 14; All in Township 5 South, Range 19 East, and containing in aggregate 413 acres, more or less, in Union County, Florida.

A parcel of land containing a total area of 20.2 acres, more or less, lying, being and situate in the Southeast 1/4 of Section 23, Township 5 South, Range 19 East, Union County, Florida, more particularly described as follows:

Commence at the Southeast corner of said Section 23, and run North 01°26'41" West, along the East line of said Section 23, a distance of 1772.43 feet; thence run South 88°33'19" West a distance of 547.12 feet; thence run South 83°15'02" West a distance of 680.64 feet to the Point of Beginning of the hereinafter described parcel of land; thence run South 02°22'22" East a distance of 295.56 feet; thence run South 52°34'00" East a distance of 665.19 feet; thence run South 26°56'06" West a distance of 300.18 feet to the intersection with the Northeast right of way line of State Road Number 100; thence run North 61°22'40" West, along said Northeasterly right of way line of State Road Number 100, a distance of 2111.71 feet to the intersection with the West line of the aforesaid Southeast 1/4 of Section 23; thence run North 02°11'23" West along said West line of Southeast 1/4 of Section 23, a distance of 200.00 feet; thence run South 80°29'05" East a distance of 1477.15 feet to the Point of Beginning.

The East 1/2 of the Southwest 1/4 of the Southwest 1/4 of Section 9, Township 3 South, Range 17 East, Columbia County, Florida.

That part of the Northwest 1/4 of Section 16, Township 3 South, Range 17 East, Columbia County, Florida, lying Westerly of the centerline of a county maintained road designated as Double Run Road. Also: That part of the Southwest 1/4 of Section 16, Township 3 South, Range 17 East, Columbia County, Florida, lying Westerly of

the centerline of a county maintained road designated as Double Run Road and lying Northeasterly of the South prescriptive right of way line of a county maintained road designated as N.E. Corene Drive.

Less and except any portion of the above described lands within the right of a public road right of way.

The Debtor, Roberts Land & Timber Investment Corp., and its President, Avery C. Roberts, will within reason continue to provide such active management and consulting services as may be requested by Farm Credit with respect to the continued development, marketing, leasing and sale of the Woodstock Industrial Site being conveyed to Farm Credit under this Plan.

The Holder of the Class 4 Claim is impaired and entitled to vote to accept or reject the Plan. Nothing contained herein shall prohibit the Debtor from objecting to the Class 4 Claim for any reason.

4.5    Class 5: Community State Bank.

4.5(a) Secured Claim of Community State Bank. Class 5(a) consists of the secured claim of Community State Bank, Loan Number *5980, in the amount of $162,419.49 which is secured by a collateral assignment of mortgages receivable.  The Debtor values these mortgages receivable at $176,027.85. The Debtor shall pay Community State Bank the sum of $162,419.49 in monthly installments amortized at 5.00 % per annum over a 20-year term each in the amount of $1,072.38; provided, however, that this indebtedness shall mature and be subject to a balloon payment of the entire principal balance and any accrued and unpaid interest 6 years from the Effective Date.

4.5(b) Partially Secured Claim of Community State Bank. Class 5(b) consists of the partially secured claim of Community State Bank, Loan Number *5578, in the amount of $648,034.06 which is secured by a mortgage lien on real property situated in St. Johns County, Florida.  The Debtor values this real property at $645,000.00 resulting in a secured claim of $645,000.00. The Debtor shall pay Community State Bank the sum of $645,000.00 in monthly installments amortized at 5.25% per annum over a 20-year term each in the amount of $4,346.29; provided, however, that this indebtedness shall mature and be subject to a balloon payment of the entire principal balance and any accrued and unpaid interest 6 years from the Effective Date.

The Holder of the Class 5 Claims is impaired and entitled to vote to accept or reject the Plan. Nothing contained herein shall prohibit the Debtor from objecting to the Class 5 Claim for any reason.

4.7    Class 6: Unsecured Claims.

> 4.6(a) Unsecured Claims.  Class 6 Claims shall consist of all amounts due and owing by Debtor on unsecured debts including contracts, notes or accounts and any deficiency amounts on secured claims. Debtor shall pay Holders of Allowed Unsecured Claims an aggregate distribution of 100% of their allowed Class 6 Claims. Holders of Class 6 Claims shall receive one hundred twenty  (120) equal monthly payments equivalent to 1/120 of their total Class 6 distribution for a period of ten years with the first payment thirty days from the Effective Date and subsequent payments continuing every month thereafter. The potential Class 6 Claimants consist of the following creditors, the respective amounts owed to them and the estimated distribution to each such creditor:

| Creditor | Amount | Payment |
|---|---|---|
| TD Bank, N.A. | $129,042.68 | $1,075.36 |

The Holders of the Class 6 Claims are impaired and entitled to vote to accept or reject the Plan. Nothing contained herein shall prohibit the Debtor from objecting to the Class 6 Claims for any reason.

Article 5
Treatment of Unclassified Claims

5.1    Pursuant to section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims against Debtor are not classified for purposes of voting on, or receiving Distributions under this Plan. Holders of such Claims are not entitled to vote on this Plan. All such Claims are instead treated separately in accordance with this Article V and in accordance with the requirements set forth in section 1129(a)(9)(A) of the Bankruptcy Code.

With respect to potential Administrative Expense Claims, Debtor, pursuant to Court order, retained The Decker Law Firm, P.A. ("Firm") to serve as bankruptcy counsel. As set forth in the employment application and supporting documents, The Firm received a prepetition retainer in the amount of $45,000.00 on behalf of Roberts Land & Timber Investment Corp. and in the amount of $5,000.00 on behalf of Union Land & Timber Corp. and as of the date hereof, the fees and expenses incurred by the Firm have/have not exceeded the retainer.  The Debtors and the Firm shall make arrangements for payment of any fees and expenses in excess of the retainer, and such shall be paid upon approval of the Court, as applicable.  The Debtors have paid post-petition bills and does not expect any claims for unpaid post-petition goods and services. The Debtors will incur quarterly trustee fees which the Debtors intend to pay when due.

5.2    Administrative Expense Claims.

5.2.1 Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, each Holder of an Allowed Administrative Expense Claim will be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash on the latest of (i) the Effective Date, (ii) as soon as practicable after the date on which such Claim becomes an Allowed Administrative Expense Claim, (iii) upon such other terms as may be agreed upon by such Holder and Debtor, or (iv) as otherwise ordered by the Bankruptcy Court; provided, however, that Allowed Administrative Expense Claims representing obligations incurred by Debtor in the ordinary course of business, or otherwise assumed by Debtor on the Effective Date pursuant to this Plan, including any tax obligations arising after the Filing Date, will be paid or performed by Debtor when due in accordance with the terms and conditions of the particular agreements or non-bankruptcy law governing such obligations.

5.2.2 Except as otherwise provided in this Plan, any Person holding an Administrative Expense Claim, other than an Administrative Expense Claim arising from the operation by Debtor of its business in the ordinary course of business, shall file a proof of such Administrative Expense Claim with the Bankruptcy Court within thirty (30) days after the entry of the Confirmation Order. At the same time any Person files an Administrative Expense Claim, such Person shall also serve a copy of the Administrative Expense Claim upon counsel for Debtor. Any Person who fails to timely file and serve a proof of such Administrative Expense Claim shall be forever barred from seeking payment of such Administrative Expense Claims by Debtor or the Estate.

5.2.3   Any Person seeking an award by the Bankruptcy Court of Professional Compensation shall file a final application with the Bankruptcy Court for allowance of Professional Compensation for services rendered and reimbursement of expenses incurred through the Effective Date within sixty (60) days after the Effective Date or within the time set by the Bankruptcy Court.

Debtor's attorney fees during the pendency of the case shall be paid as the same may be approved by the Bankruptcy Court. Debtor may pay professional fees incurred after confirmation of this Plan without Court approval. Debtor shall pay all pre-confirmation fees of professionals as payment of the same is approved by the Court.

Article 6
Means for the Implementation of the Plan

6.1 Parties Responsible for Implementation of the Plan Upon confirmation, Debtor will be charged with administration of the Case. Debtor will be authorized and empowered to take such actions as are required to effectuate the Plan, including the prosecution and enforcement of Causes of Action. Debtor will file all post-confirmation reports required by the United States Trustee's office. Debtor will also file the necessary final reports and will apply for a final decree as soon as practicable after substantial consummation and the completion of the claims analysis and objection process.

6.2     Sources of Cash for Distribution. Debtor shall pay all claims from Debtor's post

petition income from mortgage and note receivables, income from cattle grazing and hunt leases, income from the sale and development of real estate and from management income.

Debtor shall act as the Disbursing Agent to make payments under the Plan unless Debtor appoints some other person or entity to do so. Debtor may maintain bank accounts under the confirmed Plan in the ordinary course of business. Debtor may also pay ordinary and necessary expenses of administration of the Plan in due course.

6.3     Preservation of Causes of Action. In accordance with section 1123(b)(3) of the Bankruptcy Code, the Debtor will retain and may (but is not required to) enforce all Retained Actions. After the Effective Date, the Debtor, in its sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court. The Debtor (or any successors, in the exercise of their sole discretion), may pursue such Retained Actions so long as it is the best interests of the Debtor (or any successors holding such rights of action). The failure of the Debtor to specifically list any claim, right of action, suit, proceeding or other Retained Action in this Plan does not, and will not be deemed to, constitute a waiver or release by the Debtor or the Debtor of such claim, right of action, suit, proceeding or other Retained Action, and the Debtor will retain the right to pursue such claims, rights of action, suits, proceedings and other Retained Actions in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit, proceeding or other Retained Actions upon or after the confirmation or consummation of this Plan. Debtor reserve all causes of actions against current and former customer or tenant for breach of any former or now existing agreement or otherwise.

6.4     Effectuating Documents, Further Transactions. The Debtor and his officers and designees are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such action as may be necessary, desirable or appropriate to effectuate and further evidence the terms and conditions of this Plan or to otherwise comply with applicable law.

6.5     Exemption from Certain Transfer Taxes and Recording Fees. Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from the Debtor to any other Person or entity pursuant to or in contemplation of this Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtor's real or personal property will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or gents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

6.6     Further Authorization. The Debtor shall be entitled to seek such orders, judgments,

injunctions and rulings as they deem necessary or desirable to carry out the intentions and purposes, and to give full effect to the provisions, of this Plan.

6.7    Liabilities of the Debtor. The Debtor will not have any liabilities except those expressly assumed under the Plan. The Debtor will be responsible for all Operational Expenses (defined as the normal and ordinary costs and expenses of operating the Debtor's business, including, without limitation, payroll and related taxes, insurance premiums, bank charges, maintenance costs, inventory costs, and all other costs of operations of any type arising after the Petition Date in connection with the operation of the Debtor's business, unless specifically excluded under the Plan) incurred by the Debtor in the ordinary course of business after the Filing Date, and those Operational Expenses will be paid in the ordinary course of business as they become due or as agreed upon by holders of the Operational Expense claim.

Article 7
Distributions

7.1    Disbursing Agent. Unless otherwise provided for herein, all Distributions under this Plan shall be made by the Debtor or its agent.

7.2    Distributions of Cash. Any Distribution of Cash made by the Debtor pursuant to this Plan shall, at the Debtor's option, be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

7.3    No Interest on Claims or Interests. Unless otherwise specifically provided for in this Plan, the Confirmation Order, or a postpetition agreement in writing between the Debtor and a Holder, postpetition interest shall not accrue or be paid on Claims, and no Holder shall be entitled to interest accruing on or after the Filing Date on any Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a Final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.

7.4    Delivery of Distributions. The Distribution to a Holder of an Allowed Claim shall be made by the Debtor (a) at the address set forth on the proof of claim filed by such Holder, (b) at the address set forth in any written notices of address change delivered to the Debtor after the date of any related proof of claim, (c) at the addresses reflected in the Schedules if no proof of claim has been filed and the Debtor has not received a written notice of a change of address, or (d) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to the Debtor's books and records. If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Debtor is notified of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest. Amounts in respect of undeliverable Distributions made in Cash shall be retained by the Debtor until such Distributions are claimed. All Cash Distributions returned to the Debtor and not claimed within six (6) months of return shall be irrevocably retained by the Debtor

notwithstanding any federal or state escheat laws to the contrary.

7.5     Distributions to Holders as of the Record Date. All Distributions on Allowed Claims shall be made to the Record Holders of such Claims. As of the close of business on the Record Date, the Claims register maintained by the Bankruptcy Court shall be closed, and there shall be no further change in the Record Holder of any Claim. The Debtor shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. The Debtor shall instead be entitled to recognize and deal for all purposes under this Plan with the Record Holders as of the Record Date.

7.6     Reserved for Future Use.

7.7     Fractional Dollars. Any other provision of this Plan notwithstanding, the Debtor shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

7.8     Withholding Taxes. The Debtor, as the case may be, shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding and reporting requirements.

Article 8
Procedures for Treating and Resolving Disputed Claims

8.1     Objections to Claims. Debtor shall be entitled to object to Claims, provided, however, that Debtor shall not be entitled to object to Claims (i) that have been Allowed by a Final Order entered by the Bankruptcy Court prior to the Effective Date or (ii) that are Allowed by the express terms of the Plan. Any objections to Claims must be filed by the Claims Objection Deadline. The Plan defines the Claims Objection Deadline to be the later of the first Business Day which is (i) thirty (30) days after the Effective Date, or (ii) such other time as may be ordered by the Bankruptcy Court, as such dates may be from time to time extended by the Bankruptcy Court without further notice to parties in interest.

8.2     No Distributions Pending Allowance. Except as otherwise provided herein, no Distributions will be made with respect to any portion of a Claim unless and until (i) the Claims Objection Deadline has passed and no objection to such Claim has been filed, or (ii) any objection to such Claim has been settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court.

8.3.    Resolution of Claims Objections. On and after the Effective Date, the Debtor shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Claims without approval of the Bankruptcy Court.

## Article 9
## Provision for Assumption of Unexpired
## Leases and Executory Contracts

9.1     Provisions Regarding Executory Contracts

The Debtor is a party to a Lease Agreement with Wells Fargo Financial Leasing, Inc., as assignee and successor in interest to Tamco Capital Corporation ("Wells Fargo Lease"), with respect to an office communications system more particularly described and referenced in Proof of Claim Number 3-1 dated June 13, 2011. On the Effective Date, unless otherwise contained and dealt with in a motion to assume or reject the Wells Fargo Lease, the Debtor shall reject the Wells Fargo Lease.

The Debtor is not a party to any other lease or executory contract except for hunting leases and cattle leases which the Debtor will assume. These leases are not in default.

Any unexpired leases or executory contracts which are not assumed pursuant to this Plan or are the subject of a pending motion to assume shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code on the Effective Date. A proof of claim for damages arising from such rejection must be filed in compliance with the Bankruptcy Rules on or before sixty (60) days after entry of the Confirmation Order. Any claims which are not timely filed will be disallowed and discharged.

## Article 10
## Effect of Confirmation

10.1     Vesting of Debtor's Assets Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estate (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in Debtor as of the Filing Date, free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors, except as specifically provided in the Plan. As of the Effective Date, Debtor may operate its businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order.

10.2.     Discharge of the Debtor. Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in this Plan or in the Confirmation Order, the Distributions and rights that are provided in this Plan shall be in complete satisfaction, discharge, and release of all Claims, whether known on unknown, against, liabilities of, Liens on, obligations of, rights against, Debtor or his Estate that arose prior to the Effective Date. However, pursuant to section 1141(d)(5) of the Bankruptcy Code, except in limited circumstances, a discharge is not available to an individual debtor unless and until all payments have been made under the plan. Therefore, Debtor does not have a right to a discharge until all the plan payments have been made unless otherwise ordered by the Court pursuant to section 1141(d)(5) of the Bankruptcy Code. Debtor is not waiving his right to seek

entry of a discharge order before completion of all plan payments. In the event Debtor seeks entry of a discharge order after the entry of a final decree, Debtor may reopen the Case for purposes of obtaining a discharge. Additionally, the Plan shall not be construed as attempting to discharge any debt that is excepted from discharge pursuant to Bankruptcy Code sections 1141(d)(2) and 523(a)(1).

10.3     Setoffs. Debtor may, but shall not be required to, set off against any Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that Debtor may have against such Holder of a Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Debtor of any such claim that Debtor may have against such Holder of a Claim.

10.4     Exculpation and Limitation of Liability. Under the Plan, Debtor, and Debtor's current and/or post-Filing Date and pre-Effective Date advisors, attorneys, representatives, financial advisors, investment bankers, or agents and any of such parties' successors and assigns, shall not have or incur, and shall be released from, any claim, obligation, cause of action, or liability to one another or to any Holder of any Claim or Interest, or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisor, attorneys, or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Bankruptcy Cases, the negotiation and filing of the Plan, the filing of the Bankruptcy Case, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. No Holder of any Claim or Interest, or other party in interest, none of their respective agents, employees, representatives, financial advisors, or Affiliates, and no successors or assigns of the foregoing, shall have any right of action against the parties listed in this provision for any act or omission in connection with, relating to, or arising out of the Bankruptcy Case, the pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan.

10.6     Injunction. Regardless of whether the Court has entered a final decree in the Bankruptcy Case, so long as Debtor is in compliance with the Plan or the Court has entered an order granting Debtor a discharge under section 1141(d)(5) of the Bankruptcy Code, the Plan provides for a permanent injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim or Cause of provided for under the Plan, except as provided for in the Plan, to the fullest extent authorized or provided by the Bankruptcy Code.

10.7     Effect of Confirmation.

10.7.1  Binding Effect. On the Confirmation Date, the provisions of this Plan shall be binding on the Debtor, the Estate, all Holders of Claims against or Interests in the Debtor, and all other parties-in-interest whether or not such Holders are Impaired and whether or not such Holders have accepted this Plan.

10.7.2  Effect of Confirmation on Automatic Stay. Except as provided otherwise in this Plan, from and after the Effective Date, the automatic stay of § 362(a) of the Bankruptcy Code shall terminate.

10.7.3  Filing of Reports. The Reorganized Debtor shall file all reports and pay all fees required by the Bankruptcy Code, Bankruptcy Rules, U.S. Trustee guidelines, and the rules and orders of the Bankruptcy Court.

10.7.4  Post-Effective Date Retention of Professionals. Upon the Effective Date, any requirement that professionals comply with §§ 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtor will employ and pay professionals in their ordinary course of business.

Article 11
Conditions Precedent

11.1    Conditions to Confirmation. The following are conditions precedent to confirmation of this Plan that may be satisfied or waived in accordance with Article 11.3 of this Plan.

11.1.1  The Bankruptcy Court shall have approved the Disclosure Statement with respect to this Plan in form and substance that is acceptable to the Debtor, in its sole and absolute discretion; and

11.1.2  The Confirmation Order shall have been signed by the Bankruptcy Court and entered on the docket of the Bankruptcy Cases.

11.2    Conditions to the Effective Date. The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 11.3 of this Plan.

11.2.1  The Confirmation Order shall not have been vacated, reversed or modified and, as of the Effective Date, shall not be stayed;

11.2.2   All documents and agreements to be executed on the Effective Date or otherwise necessary to implement this Plan (including documents relating to the Exit Financing) shall be in form and substance that is acceptable to the Debtor in its reasonable discretion;

11.2.3   The Debtor shall have received any authorization, consent, regulatory approval, ruling, letter, opinion, or document that may be necessary to implement this Plan and that is required by law, regulation, or order.

11.3    Waiver of Conditions to Confirmation or Consummation. The conditions set forth

in Article 11.1 and Article 11.2 of this Plan may be waived, in whole or in part, by the Debtor without any notice to any other parties in interest or the Bankruptcy Court and without a hearing. The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtor in its sole discretion (with the consent of the Committee, which consent shall not be unreasonably withheld) regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtor). The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

Article 12
Retention and Scope of Jurisdiction of the Bankruptcy Court

12.1    Retention of Jurisdiction. Subsequent to the Effective Date, the Bankruptcy Court shall have or retain jurisdiction for the following purposes:

12.1.1  To adjudicate objections concerning the allowance, priority or classification of Claims and any subordination thereof, and to establish a date or dates by which objections to Claims must be filed to the extent not established herein;

12.1.2  To liquidate the amount of any disputed, contingent or unliquidated Claim, to estimate the amount of any disputed, contingent or unliquidated Claim, to establish the amount of any reserve required to be withheld from any distribution under this Plan on account of any disputed, contingent or unliquidated Claim;

12.1.3  To resolve all matters related to the rejection, and assumption and/or assignment of any Executory Contract or Unexpired Lease of the Debtor;

12.1.4  To hear and rule upon all Retained Actions, Avoidance Actions and other Causes of Action commenced and/or pursued by Debtor;

12.1.5  To hear and rule upon all applications for Professional Compensation;

12.1.6  To remedy any defect or omission or reconcile any inconsistency in this Plan, as may be necessary to carry out the intent and purpose of this Plan;

12.1.7 To construe or interpret any provisions in this Plan and to issue such orders as may be necessary for the implementation, execution and consummation of this Plan, to the extent authorized by the Bankruptcy Court;

12.1.8  To adjudicate controversies arising out of the administration of the Estates or the implementation of this Plan;

12.1.9  To make such determinations and enter such orders as may be necessary to

effectuate all the terms and conditions of this Plan, including the Distribution of funds from the Estate and the payment of claims;

12.1.10   To determine any suit or proceeding brought by the Debtor to recover property under any provisions of the Bankruptcy Code;

12.1.11   To hear and determine any tax disputes concerning the Debtor and to determine and declare any tax effects under this Plan;

12.1.12   To determine such other matters as may be provided for in this Plan or the Confirmation Order or as may be authorized by or under the provisions of the Bankruptcy Code;

12.1.13   To determine any controversies, actions or disputes that may arise under the provisions of this Plan, or the rights, duties or obligations of any Person under the provisions of this Plan;

12.1.14   To adjudicate any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of, or in connection with, any agreement pursuant to which the Debtor sold any of its assets during the Bankruptcy Case; and

12.1.15   To enter a final decree.

12.2      Alternative Jurisdiction. In the event that the Bankruptcy Court is found to lack jurisdiction to resolve any matter, then the District Court shall hear and determine such matter.  If the District Court does not have jurisdiction, then the matter may be brought before any court having jurisdiction with regard thereto.

12.3      Final Decree. The Bankruptcy Court may, upon application of the Debtor, at any time after "substantial consummation" of the Plan as defined in §1101(2) of the Bankruptcy Code, enter a final decree in the case, notwithstanding the fact that additional funds may eventually be distributed to parties in interest. In such event, the Bankruptcy Court may enter an Order closing these cases pursuant to section 350 of the Bankruptcy Code, provided, however, that: (a) the Debtor shall continue to have the rights, powers, and duties set forth in this Plan; (b) any provision of this Plan requiring the absence of an objection shall no longer be required, except as otherwise ordered by the Bankruptcy Court; and (c) the Bankruptcy Court may from time to time reopen the Bankruptcy Case if appropriate for any of the following purposes: (1) administering Assets; (2) entertaining any adversary proceedings, contested matters or applications the Debtor has brought or bring with regard to the liquidation of Assets and the prosecution of Causes of Action; (3) enforcing or interpreting this Plan or supervising its implementation; (4) entering a discharge order; or (5) for other cause.

Article 13
Miscellaneous Provisions

13.1     Modification of the Plan. Debtor shall be allowed to modify this Plan pursuant to section 1127 of the Bankruptcy Code to the extent applicable law permits. Subject to the limitations contained in this Plan, pursuant to Article 13.1 of this Plan, Debtor may modify this Plan, before or after confirmation, without notice or hearing, or after such notice and hearing as the Bankruptcy Court deems appropriate, if the Bankruptcy Court finds that the Modification does not materially and adversely affect the rights of any parties in interest which have not had notice and an opportunity to be heard with regard thereto. In the event of any modification on or before confirmation, any votes to accept or reject this Plan shall be deemed to be votes to accept or reject this Plan as modified, unless the Bankruptcy Court finds that the modification materially and adversely affects the rights of parties in interest which have cast said votes. Debtor reserves the right in accordance with section 1127 of the Bankruptcy Code to modify this Plan at any time before the Confirmation Date.

13.2     Allocation of Plan Distributions Between Principal and Interest. To the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

13.3     Applicable Law. Except to the extent that the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under this Plan shall be governed by the laws of the State of Florida.

13.4     Preparation of Estate Returns and Resolution of Tax Claims. The Debtor shall file all tax returns and other filings with governmental authorities and may file determination requests under section 505(b) of the Bankruptcy Code to resolve any Disputed Claim relating to taxes with a governmental authority.

13.5     Headings. The headings of the Articles and the sections of this Plan have been used for convenience only and shall not limit or otherwise affect the meaning thereof.

13.6     Revocation of Plan. The Debtor reserves the right, unilaterally and unconditionally, to revoke and/or withdraw this Plan at any time prior to entry of the Confirmation Order, and upon such revocation and/or withdrawal this Plan shall be deemed null and void and of no force and effect.

13.7     No Admissions; Objection to Claims. Nothing in this Plan shall be deemed to constitute an admission that any individual, corporation, partnership, trust, venture, governmental unit, or any other form of legal entity as being the Holder of a Claim is the Holder of an Allowed Claim, except as expressly provided in this Plan. The failure of the Debtor to object to or examine any Claim for purposes of voting shall not be deemed a waiver of the Debtor's rights to object to or reexamine such Claim in whole or in part.

13.8    No Bar to Suits. Except as otherwise provided in Article 10 of this Plan, neither this Plan or confirmation hereof shall operate to bar or estop the Debtor from commencing any Cause of Action, or any other legal action against any Holder of a Claim or any individual, corporation, partnership, trust, venture, governmental unit, or any other form of legal entity, whether such Cause of Action, or any other legal action arose prior to or after the Confirmation Date and whether or not the existence of such Cause of Action, or any other legal action was disclosed in any disclosure statement filed by the Debtor in connection with this Plan or whether or not any payment was made or is made on account of any Claim. Without limitation, Debtor retains and reserves the right to prosecute Retained Actions.

13.9    Exhibits/Schedules. All exhibits and schedules to this Plan, and all attachments thereto, are incorporated into and are a part of this Plan as if set forth in full herein.

13.10    Conflicts. In the event that provisions of the Disclosure Statement and provisions of this Plan conflict, the terms of this Plan shall govern.

Article 14
Tax Consequences

Tax consequences resulting from confirmation of this Plan can vary greatly among the various Classes of Creditors and Holders of Interests, or within each Class. Significant tax consequences may occur as a result of confirmation of the Plan under the Internal Revenue C ode and pursuant to state, local, and foreign tax statutes. Because of the various tax issues involved, the differences in the nature of the Claims of various Creditors, the taxpayer status and methods of accounting and prior actions taken by Creditors with respect to their Claims, as well as the possibility that events subsequent to the date hereof could change the tax consequences, no specific tax consequences to any Creditor or Holders of an Interest are represented, implied, or warranted.

**The proponent assumes no responsibility for the tax effect that consummation of this Plan will have on any given Holder of a Claim or Interest. Holders of Claims or Interest are strongly urged to consult their own tax advisors covering the federal, state, local and foreign tax consequences of the Plan to their individual situation.**

Respectfully submitted, this 26th day of July, 2011.

Roberts Land & Timber Investment Corp.

By_____
    Avery C. Roberts
    President

Union Land & Timber Corp.

By_____

       Avery C. Roberts
       President


THE DECKER LAW FIRM, P. A.


BY_____*/s/ Andrew J. Decker, III*_____
Andrew J. Decker, III, Esquire
Florida Bar No. 267211
320 White Avenue - Street Address
Post Office Drawer 1288 - Mailing Address
Live Oak, Florida 32064
Telephone:          (386) 364-4440
Telecopier:        (386) 364-4508
Email[AJD,III]:    decklaw@windstream.net
Proposed Attorneys for Debtors, Roberts Land &
Timber Investment Corp. and Union Land & Timber
Corp.

11108

31